## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BLB AVIATION SOUTH CAROLINA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 8:10CV42 |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| JET LINX AVIATION LLC, JET LINX | ) | |
| AVIATION CORPORATION, JET LINX | ) | |
| MANAGEMENT COMPANY, LLC, | ) | |
| and JAMIE WALKER, | ) | |
| | ) | |
| Defendants. | ) | |

This is an action to determine the parties' rights and responsibilities related to agreements involving the lease, maintenance, and management of aircraft. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. Pursuant to 28 U.S.C. § 636 and the consent of the parties,[1] the matter was tried to the undersigned magistrate judge February 6-8, 2012. The parties submitted closing arguments in writing, whereupon the case was deemed submitted for decision.

## BACKGROUND

The parties' dispute arises from their business relationship entered to allow the defendants' aircraft charter flight services operation to use the plaintiff's aircraft. The plaintiff BLB Aviation South Carolina, LLC (BLB), an aviation company based in Baton Rouge, Louisiana, owned aircraft. **See** Filing No. 148 - Pretrial Order (PTO) ¶ B(9). The defendants operate an aircraft charter business. **Id.** ¶ B(12). After the defendant Jamie Walker (Walker) contacted BLB, BLB and the defendants Jet Linx Aviation, LLC, Jet Linx Aviation Corporation, and Jet Linx Management Company, LLC (collectively Jet Linx) entered into two contracts that allowed Jet Linx to use two aircraft owned by BLB for

---

[1] On July 15, 2011, United States Chief District Joseph F. Bataillon transferred this matter to the undersigned magistrate judge. **See** Filing No. 124.

charter flight services. *Id.* ¶¶ B(10), B(16), B(24).  BLB alleges the defendants fraudulently and negligently induced BLB to purchase an aircraft, breached both contracts between the parties, and breached the covenant of good faith and fair dealing by charging unwarranted maintenance charges.  *Id.* ¶ B(38).  The defendants deny liability to BLB, arguing the parties entered into an accord and satisfaction on BLB's claims, and assert a claim against BLB for unpaid maintenance charges.  *Id.* ¶¶ B(39), C(18).

Before trial, BLB filed a trial brief (Filing No. 155) and proposed findings of fact and conclusions of law (Filing No. 154).  The defendants filed a trial brief (Filing No. 157) and proposed findings of fact and conclusions of law (Filing No. 156).  At the conclusion of BLB's case-in-chief, the defendants made an oral motion for judgment as a matter of law, which the court took under advisement.  **See** Filing No. 173 (court minutes); Trial Transcript (TR.) 564-568.  After the trial transcript (Filing Nos. 184, 185, and 186) was completed, the parties simultaneously filed written closing arguments, then replies.  BLB filed a brief (Filing No. 189) and a reply brief (Filing No. 192).  The defendants filed a brief (Filing No. 190) and a reply brief (Filing No. 191).  At the conclusion of briefing, the matter was deemed submitted.

## FINDINGS OF FACT

Based on the evidence presented and pursuant to Fed. R. Civ. P. 52(a)(1), the court makes the following findings of fact:

BLB is a South Carolina limited liability company with its principal place of business in Baton Rouge, Louisiana.  **See** Filing No. 148 - PTO ¶ B(1).  The members of BLB are Barry L. Bellue, Sr. (Barry Bellue) and Barry L. Bellue, Jr. (Lee Bellue), both of whom are citizens of the State of Louisiana.  *Id.*  Jet Linx Aviation, LLC is a Delaware limited liability company with its principal place of business in Omaha, Nebraska.  *Id.* ¶ B(2).  Jet Linx Aviation Corporation and Jet Linx Management Company, LLC are Delaware corporations with their principal place of business in Omaha, Nebraska.  *Id.* ¶¶ B(3), B(4).  Walker, an individual, is a resident and citizen of the State of Nebraska.  *Id.* ¶ B(5).  There is no dispute the court has personal jurisdiction over the parties and subject matter jurisdiction,

pursuant to 28 U.S.C. § 1332(a)(1).  *Id.* ¶¶ B(6), B(7).  The parties also agree venue is proper.  *Id.* ¶ B(8).

BLB is an aviation company based in Baton Rouge, Louisiana.  *Id.* ¶ B(9).  BLB owned and owns aircraft that have, from time to time, been used for aircraft charter flight services.  *Id.*  On or about March 29, 2007, Walker, the president of Jet Linx Management Company, contacted BLB regarding the possibility of entering into a dry lease or charter agreement for a Diamond 1A airplane.  *Id.* ¶ B(10); TR. 597.  In response, Lee Bellue called Walker during the first week of April 2007 regarding Jet Linx's proposal to use BLB's existing aircraft in Jet Linx's charter operations.  **See** Filing No. 148 – PTO ¶ B(10).  In addition to discussions regarding Jet Linx's management of BLB's existing aircraft, Walker and Lee Bellue discussed the possibility of entering into a dry lease agreement if BLB purchased another aircraft.  *Id.* ¶ B(12).  Walker explained the terms and procedures for a dry lease under which Jet Linx would lease an additional plane from BLB.  *Id.*

In June 2007, BLB contacted an aircraft broker to purchase a type of aircraft Jet Linx had indicated would be suitable for management under a dry lease agreement.  *Id.* ¶ B(13).  Ultimately, the broker identified a Mitsubishi MU300 Diamond 1A jet aircraft, bearing aircraft registration number N400GK (N400GK).  *Id.*  Tony Boatwright (Boatwright), the Jet Linx head of maintenance, met Lee Bellue in Little Rock, Arkansas, to evaluate N400GK's suitability for use in Jet Linx's charter flights services.  *Id.* ¶ B(14).  N400GK was acceptable to Jet Linx, if BLB refurbished the interior.  *Id.*  On or about August 10, 2007, BLB purchased N400GK.  *Id.* ¶ B(15).  BLB invested $1,350,000 to purchase and upgrade N400GK, including approximately $50,000 for the new interior.  *Id.*  As part of the purchase agreement, the aircraft underwent equipment inspection and maintenance by Central Flying Service beginning in June, 2007.  *Id.*

On or about June 20, 2007, BLB and Jet Linx executed an Aircraft Dry Lease Agreement for N400GK (the Dry Lease Agreement).  *Id.* ¶ B(16); Ex. 20.  The Dry Lease Agreement provides, "[t]his Lease of aircraft is made effective as of August 1, 2007."  Ex. 20 p. 1.  The Dry Lease Agreement states, "[Jet Linx] guarantees [BLB] a minimum monthly lease payment of $47,100 per month, no matter the number of actual hours flown."  Ex. 20 § 1 and Sched. A.  The $47,100 amount is equal to 50 hours of flight time multiplied

by a $942 hourly rate. *Id.* Sched. A.  The Dry Lease Agreement anticipated flight time in excess of the initial 50 hours would be paid based on an hourly rate. *Id.*  With the exception of maintenance costs, Jet Linx agreed to pay for all costs associated with N400GK during the term of the lease, including fuel, pilots, training, hangar, and insurance. **See** Filing No. 148 - PTO ¶ B(16); Ex. 20 Sched. A.

Under the Dry Lease Agreement, certain maintenance charges were to be passed through to BLB at Jet Linx's cost. **See** Filing No. 148 - PTO ¶ B(17); Ex. 20 § 7 and Sched. A.  The Dry Lease Agreement states:

> Lessor will pay for:
> - maintenance (unscheduled maintenance, [Federal Aviation Regulations] FAR Part 135 conformity, minor inspections and A and B inspections will be performed by Jet Linx maintenance technicians at a Labor Rate of $75 per hour and Parts plus 15%.  Major inspections and C and D inspections will be performed by an agreed upon third party).

Ex. 20 Sched. A.

The Dry Lease Agreement further provides:  All "inspections, repairs, modifications, maintenance, and overhaul work" would be performed "in accordance with the standards set by Federal Aviation Regulations." Ex. 20 § 7.  Jet Linx agreed to "maintain log books and records accurately reflecting the completion of such maintenance work during the term of the Lease in accordance with the Federal Aviation Regulations." Filing No. 148 - PTO ¶ B(18); **see** Ex. 20 § 7.

BLB delivered N400GK to Jet Linx in Omaha, Nebraska, on approximately August 24, 2007.  **See** Filing No. 148 - PTO ¶ B(20); TR. 602.  N400GK underwent additional maintenance and was available for its first revenue producing flight in October 2007.  **See** TR. 602-603.  In certain months during the term of the Dry Lease Agreement, Jet Linx paid BLB less than the $47,100 minimum monthly payment under the Dry Lease Agreement. **See** Filing No. 148 - PTO ¶ B(21).  Jet Linx sent BLB monthly statements deducting maintenance expenses incurred on the N400GK from the amounts due BLB under the Dry Lease Agreement.  *Id.* ¶ B(22).

During the time the parties negotiated the Dry Lease Agreement, the parties negotiated an arrangement for BLB's existing aircraft (N789DJ) to be available for Jet Linx

to charter out of Baton Rouge, Louisiana.  **See** Filing No. 148 - PTO ¶ B(23).  On or about August 16 or 17, 2007, BLB and Jet Linx executed an Aircraft Management Services Agreement (MSA), effective August 26, 2007, for BLB's existing aircraft, N789DJ, based in Baton Rouge, Louisiana.  *Id.*; Ex. 48 p. 1, 11, 13.  Under the MSA, the parties agreed "BLB would make the aircraft available for a certain number of charter hours each month" and Jet Linx would remit a $12,000 annual Aircraft Management Fee paid in installments of $1,000 each month.  **See** Filing No. 148 - PTO ¶ B(23); Ex. 48 - MSA Ex. 1.  The parties agreed BLB would receive 85% of charter revenue Jet Linx generated per hour with a minimum of $1,572.50 per flight hour plus a fuel surcharge.  **See** Filing No. 148 - PTO ¶ B(23); Ex. 48 - MSA Attach. 1.

Under the MSA, "Jet Linx agreed to ensure that all maintenance and repair work on N789DJ was performed in accordance with the standards set out in the Federal Aviation Regulations and to ensure that all such maintenance work was accurately recorded in accordance with the Federal Aviation Regulations applicable to Jet Linx's operation."  **See** Filing No. 148 - PTO ¶ B(26).  Additionally, the parties agreed BLB would reimburse Jet Linx for expenses such as routine and non-routine maintenance.  **See** Ex. 48 - MSA p. 5 and Ex. 3 ¶ g.  Jet Linx sent BLB monthly statements deducting N789DJ's maintenance expenses from the amount due BLB under the MSA.  **See** Filing No. 148 - PTO ¶ B(27).

From nearly the beginning of the contractual relationship between the parties, disputes arose regarding amounts due from Jet Linx to BLB under the Dry Lease Agreement and MSA.  **See** Filing No. 148 – PTO ¶ (B)28.  Disputes also arose regarding maintenance expenses Jet Linx charged to BLB.  *Id.*  In May and June of 2008, the disputes between the parties began to escalate.  *Id.* ¶ (B)30.

On June 4, 2008, Barry Bellue requested that N789DJ be taken off Jet Linx's certificate and control of the aircraft be turned over to BLB.  *Id.*; Exs. 14, 47.  BLB subsequently took over management of N789DJ.  **See** Filing No. 148 - PTO ¶ (B)30.  Also on June 4, 2008, Jet Linx informed BLB that it was not interested in continuing the Dry Lease Agreement after its August 1, 2008, expiration date under the existing terms and proposed to BLB that Jet Linx continue to lease N400GK under a dry lease agreement with terms different from the original Dry Lease Agreement.  *Id.* ¶ (B)31; Ex. 64.  The parties

subsequently entered into discussions about N400GK possibly remaining with Jet Linx under different lease terms.  **See** <u>Filing No. 148</u> - PTO ¶ (B)31.  The parties did not reach such an agreement.  ***Id.***

From June through August of 2008, the parties had various discussions regarding how much money the parties owed each other as the parties' contractual relationship was about to end.  ***Id.***; Exs. 60, 63.  On August 6, 2008, Jamie R. Barrett (Barrett) of Jet Linx sent a letter to BLB in which he stated that the parties had reached an agreement to end the Dry Lease Agreement and settle the outstanding disputes between the parties regarding payments owed.  **See** <u>Filing No. 148</u> - PTO ¶ (B)34; Ex. 66.  The August 6, 2008, letter enclosed a check to BLB for $12,347.50.  **See** <u>Filing No. 148</u> - PTO ¶ (B)34; Ex. 66. On August 8, 2008, Barry Bellue sent an email to Barrett and Walker, objecting to some of the maintenance charges discussed in the August 6, 2008, letter and ending the remarks by writing, "I will keep open my options."  **See** <u>Filing No. 148</u> - PTO ¶ (B)34; Ex. 68.  On August 14, 2008, BLB cashed the check enclosed with the August 6, 2008, letter. **See** <u>Filing No. 148</u> - PTO ¶ (B)34; Ex. 67.  On November 6, 2008, Barry Bellue told Jet Linx to buy N400GK for $1.2 million or he would file a lawsuit.  **See** <u>Filing No. 148</u> - PTO ¶ (B)35; Ex. 144.  Barrett replied, Jet Linx "has no interest in acquiring 400GK."  **See** <u>Filing No. 148</u> - PTO ¶ (B)35; Ex. 144.

On February 19, 2008, James Clark (Clark), the pilot in command, and Shannon Montanye (Montanye), the second in command, both Jet Linx employees, flew N789DJ from Omaha, Nebraska, to Sioux Falls, South Dakota.  **See** Ex. 1 - Clark incident report. After arriving in Sioux Falls, Clark performed a post-flight inspection of N789DJ.  ***Id.***  Clark checked the port and starboard engines and found acceptable oil levels, replaced the caps, closed the caps, and turned the triggers in the down position.  ***Id.***  Clark noted both engines were a quart low on oil.  ***Id.***

On February 20, 2008, Clark and Montanye operated N789DJ when, prior to takeoff, the aircraft lost significant oil pressure.  **See** <u>Filing No. 148</u> - PTO ¶ B(29); Ex. 1.  When Clark started the engine, all warning lights were green.  **See** Ex. 1.  Clark taxied N789DJ to the runway and was cleared for takeoff.  ***Id.***  Before takeoff, Clark and Montanye noticed the port-side engine low oil pressure light illuminated.  ***Id.***; Ex. 2 - Montanye incident report.

Montanye also noted the oil pressure gauge read zero.  **See** Ex. 2.  Montanye informed the flight control tower dispatcher who suggested Clark taxi off the runway.  **See** Ex. 1.  Montanye instructed Clark to taxi clear of the runway and called Boatwright.  **Id.**; Ex. 2.  As Clark taxied clear of the runway, the pilots shut down the engine in accordance with Boatwright's instruction.  **Id.**  Once taxied, Clark checked the oil cap on the port engine.  **See** Ex. 1.  Clark observed the cap was still in place, but loose, and oil poured out of the cowling.  **Id.**  The mechanic onsite removed the lower engine cowling and found the dipstick laying in the cowling.  **See** TR. 321:16-17.

On February 29, 2008, Dallas Airmotive performed a tear-down inspection of N789DJ in accordance with the Pratt and Whitney JT15D-4D Maintenance Manual, Section 72-00-00, Unscheduled Inspection For Oil Loss, which requires the engine be removed and taken to an approved overhaul facility when oil pressure drops below a certain level.  **See** Ex. 101.  Dallas Airmotive removed and inspected the engine, resulting in significant maintenance and repair charges.  **See** Filing No. 148 - PTO ¶ B(29).  Dallas Airmotive noted, "the oil filler cap exhibited cracking in the top locking feature of the assembly."  **See** Ex. 101.  Dallas Airmotive concluded the probable cause of distress was from "[l]oss of oil from the engine [due] to a loose filler cap during engine runs in the field."  **Id.**

After the incident, Clark and Montanye submitted statements describing the February 20, 2008, incident to Mike Kopp (Kopp), Jet Linx's Chief Pilot.  **See** Exs. 1, 2.  Jet Linx disciplined Clark for failing to check the security of the oil cap the morning of the flight.  **See** Ex. 3 - Employee Disciplinary Report.  Jet Linx also disciplined Clark for failing to shut down the engine immediately following the indication of low oil pressure.  **Id.**  Jet Linx determined Clark's failure to follow Jet Linx's policies "resulted in significant avoidable expense to the company." **Id.**

On April 28, 2008, Jet Linx submitted an insurance claim for the February 20, 2008, oil loss incident.  **See** Ex. 344.  AIG Aviation determined the engine damage occurred because of a mechanical failure and denied the claim on October 16, 2008.  **See** Ex. 100.  After reconsideration, AIG Aviation maintained the denial of coverage on December 30, 2008.  **Id.**  Also, on December 30, 2008, Jet Linx sent BLB an invoice for $158,014.98 for

7

N789DJ's maintenance charges.  **See** Filing No. 148 - PTO ¶ B(37); Ex. 36.  BLB refused to pay arguing the charges were not BLB's responsibility because Jet Linx's pilots' negligence caused the engine damage.  ***Id.*** - PTO ¶ B(37).

After an investigation, on January 5, 2010, the FAA concluded evidence suggested the oil cap was not properly installed at the time of the incident.  **See** Ex. 101.  The FAA also noted the evidence suggested although the lock tab was cracked, the cap locking feature still functioned.  ***Id.***

## CONCLUSIONS OF LAW

Nebraska contract law governs this diversity action.  **See** Filing No. 154 - Plaintiff's Proposed Findings of Fact and Conclusions of Law p. 19 ¶ 97; **see generally** Filing No. 156 - Defendants' Proposed Findings of Fact and Conclusions of Law p. 10-15; **see also** ***JN Exploration & Prod. v. W. Gas Res., Inc.***, 153 F.3d 906, 909 (8th Cir. 1998) (stating "it is axiomatic that federal courts apply state substantive law in diversity suits") (**citing *Erie R.R. Co. v. Tompkins***, 304 U.S. 64, 78 (1938)).  When a federal district court exercises its diversity jurisdiction over claims brought under state law causes of action, it is bound by the state's law as determined by the highest court in that state.  ***Foy v. Klapmeier***, 992 F.2d 774, 780 (8th Cir. 1993).  "If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State."  ***Comm'r v. Estate of Bosch***, 387 U.S. 456, 465 (1967); **see also *First Colony Life Ins. Co. v. Berube***, 130 F.3d 827, 829 (8th Cir. 1998) (stating a federal court exercising diversity jurisdiction "must predict how the state's highest court would decide the issue").

## A.    Accord and Satisfaction

The parties dispute whether they reached an accord and satisfaction, in August 2008, settling their disagreements about the maintenance charges, lease payments, and charter revenues owed to each other under the Dry Lease Agreement and MSA.  **See** Filing No. 148 - PTO p. 13 ¶ C(18).  Jet Linx contends the parties settled or compromised the amounts owing with regard to both aircraft, except for the expenses incurred for

N789DJ as a result of the February 20, 2008, oil loss incident.  **Id.**  BLB denies the parties settled the matter.  **See** Filing No. 189 - Plaintiff's Closing p. 21.

"An executed compromise settlement of a good faith controversy is an accord and satisfaction." **Farmland Serv. Coop., Inc. v. Jack**, 242 N.W.2d 624, 626 (Neb. 1976). "An accord and satisfaction is a discharge of an existing indebtedness by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant in full satisfaction of the claim." **Mischke v. Mischke**, 571 N.W.2d 248, 256 (Neb. 1997).  The party seeking to enforce an accord and satisfaction has the burden to prove "(1) a bona fide dispute between the parties, (2) substitute performance tendered in full satisfaction of the claim, and (3) acceptance of the tendered performance." **Lone Cedar Ranches, Inc. v. Jandebeur**, 523 N.W.2d 364, 369 (Neb. 1994).

The evidence clearly establishes a bona fide dispute between the parties about the maintenance charges, lease payments, and charter revenues owed under the Dry Lease Agreement and MSA.  Additionally, BLB accepted a $12,347.50 payment from Jet Linx.  **See** Filing No. 148 - PTO ¶ (B)34; Exs. 66, 68.  The key element of accord and satisfaction, and the key issue here, is the intent of the parties.  **See Mischke**, 571 N.W.2d at 256. Such intent generally presents a question of fact unless the evidence creates no conflict as to intent, then intent is determined as a matter of law.  **Lone Cedar**, 523 N.W.2d at 369.  Accordingly the defendants must show the parties had a meeting of the minds to resolve their dispute in exchange for the tendered substitute performance.  **See id.**; **Peterson v. Kellner**, 513 N.W.2d 517, 519-20 (Neb. 1994) (finding no accord where payment amount and explanation letter were inconsistent).

The defendants contend Barry Bellue's conduct including negotiations to conclude the parties' business relationship, verbal and written statements culminating in his August 8, 2008, email, and cashing Jet Linx's $12,347.50 payment are sufficient evidence of the parties' accord and satisfaction.  **See** Filing No. 190 - Defendants' Closing p. 9-14.  The defendants argue Barry Bellue's conduct is sufficient evidence to determine intent as a matter of law.  **Id.** at 14-17.

"[T]ender of a check does not work an accord and satisfaction unless there is a condition that the money be accepted as full payment or not accepted at all." *Journal Broad. Group, Inc. v. Spaghetti Works Rests.*, No. A-99-480, 2000 WL 1375541, at *3 (Neb. App. Sept. 26, 2000); **see** *Peterson*, 513 N.W.2d at 519-20 (finding no accord despite accepting payment).  Nevertheless,

> [It] is a well-settled principle of Nebraska law that where a certain sum of money is tendered by a debtor to a creditor on condition that he accept it in full satisfaction of his demand, the sum due being in dispute, the creditor must either refuse the tender or accept it as made subject to the condition.  *If he accepts it, he accepts the condition also, notwithstanding any protest he may make to the contrary*.

*Rees v. Huffman*, 384 N.W.2d 631, 634-35 (1986) (quoting *Langness v. "O" Street Carpet Shop*, 353 N.W.2d 709, 713 (1984)).  At a minimum, "use of the [payment] enclosed should . . . be *considered* in determining whether or not there is an accord and satisfaction." *Cox v. City of Freeman, Mo.*, 321 F.2d 887, 892 (8th Cir. 1963) (emphasis added).

On June 23, 2008, Barry Bellue stated he received a billing statement related to N789DJ and asked Barrett if it were the final billing.  **See** Ex. 62.  The parties continued to "navigate this wrap up" to "finalize [their] business" by discussing and negotiating the various maintenance and other charges until August.  **See** Exs. 61, 62, 63, 336, 337, and 339.  The August 6, 2008, letter from Barrett states:

> Dear Barry:
> As a follow up to our phone conversation of Friday, August 1, Jet Linx is in agreement with your offer to end the aircraft lease agreement for N400GK dated August 1, 2007 in the following manner:
> 1.    Jet Linx will pay BLB Aviation South Carolina LLC (BLB) reduced minimum monthly lease payments of $16,000 from $47,100 for each month of June and July and the aircraft dry lease will terminate effective July 31, 2008.
> 2.    BLB will pay Jet Linx for work orders totaling $4,032.58 (see attached detail) for items outlined in WO6629 for maintenance items incurred in June for the amount of $2,260.92 plus $1,771.66 (our cost), for reimbursement

10

3. Barry Bellue will pay the outstanding balance of the June 2008 monthly billing for Owner's Overhead & Operating Expenses for N789DJ in the amount of $15,619.92.

4. In order to facilitate the transaction, Jet Linx will agree to net out the amounts owed by each party:  Jet Linx $16,000 plus $16,000 and BLB $4,021.58 plus $15,619.92 with a difference of $12,347.50 owed by Jet Linx.  A check in that amount is enclosed.

Barry, all of us at Jet Linx wish you and Lee the best in all of your future aviation endeavors.  Perhaps our paths will cross again in the future.  In keeping with our commitment to you, we appreciate that both parties were able to work out an acceptable agreement.

Ex. 66.

BLB cashed the check and Barry Bellue responded by email dated August 8, 2008. **See** Exs. 67, 68.  The subject line contains the notation "final check."  Ex. 68.  The text of the message states:

You guys deserve the ultimate in awards for shaking down the wealthy who put their planes in your care.  In our ***final wrap up*** we get hit with a $4,000+ bill for creative charges.  Thank God we have finally escaped your shack [sic] downs. . . .  I can't see how JetLinx will survive this fraudulent and questionable business conduct.  I will watch with special attention to see the future of your company.   You guys are shady and unscrupulous business dudes that talk a noble and sacred line to you [sic] unsuspecting clients.  ***I will keep open my options***.

Ex. 68 (emphasis added).

Barry Bellue testified at trial that he wrote the August 8, 2008, email immediately after he received the August 6, 2008, letter to "let them know that I didn't settle anything." TR. 478.  Barry Bellue testified that prior to receiving the August 6, 2008, letter, he did not know it was coming and it was a "ploy to try to suggest that [he] had reached some sort of settlement with [Jet Linx]."  TR. 477-478.  However, during his deposition Barry Bellue described the letter saying, "This was a letter that Jamie Barrett sent, based on me fighting tooth and nail with him over a lot of issues and this was a letter that was sent after [they

returned N400GK]."   Barry Bellue Depo. p. 32.   Barry Bellue stated he now knows the defendants contend the August 6, 2008, letter was a final settlement, but "[t]here was never any discussion of settlement.   We were trying to get an aircraft back, and if they wanted to pay me anything at the end, I'm thankful. . . ."  *Id.* at 36.   Barry Bellue admitted, "I responded to [the letter] . . . unprofessionally [and] . . . . the relationship was over with." *Id.* at 32.   Communications between the parties ceased until Barry Bellue contacted Jet Linx on November 6, 2008, suggesting Jet Linx purchase N400GK or he would file a federal lawsuit and FAA complaint.  **See** Ex. 144.   Again on March 3, 2009, Barry Bellue offered to sell N400GK to Jet Linx in exchange for BLB releasing all claims relating to N789DJ and Jet Linx dropping any claims for maintenance charges relating to that plane. **See** Ex. 70.

The court finds no meeting of the minds existed to settle the claims between the parties as of the August 6, 2008, letter and August 8, 2008, response.  The parties were engaged in negotiations over the termination of their business relationship, however the business relationship ended with the expiration of the one-year lease and Barry Bellue's June 4, 2008, request to terminate the MSA.  Although the parties continued to attempt to negotiate a financially beneficial arrangement involving the operation of the aircraft, they were unable to do so.   Therefore, references to the end of the parties' business relationship does not indicate Barry Bellue's intent to enter an accord and satisfaction. Similarly, the parties' lack of continued discussions immediately following the August 8, 2008, email does not support Barry Bellue's intent to enter an accord and satisfaction. Barry Bellue admitted his email was unprofessional and likely the parties would allow the conflict to cool while waiting for additional information, such as whether BLB could sell N400GK and the insurance decision about N789DJ.  In the fall of 2008 both parties would reasonably have known they had unfinished concerns.

The defendants argue Barry Bellue's failure to explicitly object, on August 8, 2008, to the substituted terms of performance contained in the August 6, 2008, letter is evidence of an accord.  The reasonable alternative, and BLB's position, is Barry Bellue rejected the entire offer of substituted terms.  Although, the August 8, 2008, email subject line states "final check," Barry Bellue's statements in the email and later correspondence indicate his

intent was to proceed with litigation or other means to obtain the funds he felt were owed. BLB cashed the check because the Bellues knew the defendants owed BLB for outstanding lease payments.  Moreover, Barry Bellue testified he did not handle the check, which was likely deposited by a member of his staff.  **See** Barry Bellue Depo. p. 34-35. Finally, neither the August 6, 2008, letter, nor the check itself stated there was a condition the money be accepted as full payment or not accepted at all.  Under the circumstances present in this case, BLB's cashing Jet Linx's $12,347.50 payment does not support Barry Bellue's intent to enter an accord and satisfaction.  When viewed as a whole, Barry Bellue's statements and conduct are evidence he did not have the intent to enter into an accord and satisfaction in August 2008.

The defendants' conduct similarly suggests the defendants knew the parties had not reached an accord in August 2008.  The defendants later sought payment for additional maintenance charges.  Additionally, the defendants failed to mention the August 6, 2008, accord when Barry Bellue threatened litigation in November 2008 and sought settlement in March 2009.


**B.    Misrepresentation**

BLB argues Walker knowingly made material false misrepresentations to BLB regarding the maintenance expenses, flight hours, and profit BLB could reasonably expect to earn if BLB purchased an aircraft and leased it to Jet Linx, which misrepresentation induced BLB to purchase N400GK.  **See** Filing No. 148 - PTO ¶ C(1); Filing No. 155 - Plaintiff's Trial Brief p. 18-22.  BLB contends it sought detailed information from Walker about the possibility of a dry lease agreement to determine whether the venture would be profitable.  **See** Filing No. 189 - Plaintiff's Closing p. 5.  BLB contends Walker's responses to this request constitute material false misrepresentations inducing BLB to purchase N400GK and enter into the Dry Lease Agreement at issue.  **Id.**  Specifically, Walker indicated the agreement would be based on a guaranteed minimum of 50 hours of flight time each month, but based on his experience Jet Linx could easily fly an aircraft dry leased from BLB to Jet Linx for 60-70 hours each month.  **See** Ex. 74, 80; TR. 64-65; 75-76.  Additionally, at Lee Bellue's request Walker provided "maintenance projections" based

on Jet Linx's experience with Diamond Jet aircraft used in charter operations.  Walker provided "maintenance projections" indicating costs for scheduled maintenance and unscheduled maintenance, the latter which was $21,396 over a 12-month period for aircraft flown an average of 50 hours each month.  **See** Ex. 74 p. 5.  Based on Walker's representations, Lee Bellue prepared a budget to assess the profitability of purchasing an aircraft for lease to Jet Linx.  **See** Ex. 152; TR. 76-80.

Nebraska adopted Restatement (Second) of Torts § 552, which outlines the elements of negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Knights of Columbus Council 3152 v. KFS BD, Inc.*, 791 N.W.2d 317, 330 (Neb. 2010) (**quoting** Restatement (Second) of Torts § 552).

"Generally, fraud cannot be based on predictions or expressions of mere possibilities in reference to future events."  *Outlook Windows P'ship v. York Int'l. Corp.*, 112 F. Supp. 2d 877, 894 (D. Neb. 2000) (**citing** *NECO v. Larry Price & Assoc.*, 597 N.W.2d 602, 606 (1999)).  An exception to the general rule exists when "the future event is within the control of the person making the representation."  *Outlook Windows*, 112 F. Supp. 2d at 894.  The recipient of the information must prove he reasonably relied on it. *Cao v. Nguyen*, 607 N.W.2d 528, 532 (2000).

On April 19, 2007, Lee Bellue asked Walker, "If we do dry lease with the Diamond, would . . . your company still be willing to do the remote charter here in Baton Rouge with another airplane.  We would buy an additional aircraft, probably a Beech 400A.  We would be interested in at least 200 to 300 hrs per year."  Ex. 74.  Walker responded on April 20, 2007, "We would jump at the chance to offer you service out of Baton Rouge and could easily offer you 200-300 of additional charter revenue, depending on your own utilization." *Id.*  At that time, Lee Bellue understood he and Walker were discussing the projected flight hours for N789DJ.  TR. 64-65.  Attached to the April 20, 2007, email was a spreadsheet

describing "estimated costs" for scheduled and unscheduled maintenance.  Ex. 74 p. 5.
The "non-scheduled maintenance" is defined as, "estimated at 12 tire changes, 1 brake
change, and 10% of squawk[2] recovery for items occurring outside of inspections per 12
months."  *Id.*  The estimate for an aircraft in 2008 for non-scheduled maintenance based
on 600 hours flight time was listed as $21,396.  *Id.*  This figure is not explicitly represented
on Lee Bellue's budget, which lists a general "maintenance reserves" category showing
$90,000 and was prepared for an aircraft other than the N400GK.  **See** Ex. 152; TR. 80-81.

By May 8, 2007, Lee Bellue had agreed to purchase another aircraft for the purpose
of leasing it to Jet Linx.  **See** Ex. 16; TR. 69-70.  On May 15, 2007, Walker responded to
Lee Bellue's concerns about revenue and the number of projected flight time hours by
stating, "We will commit to the 50 hour lease payment per month to meet you in the middle
and hopefully we'll get 60 hours."  Ex. 80.  Lee Bellue testified at trial Walker told him
Walker "felt" Jet Linx would be able to fly the leased aircraft 60 to 70 hours each month.
TR. 75-76.

BLB fails to sustain its burden of proving negligent misrepresentation.  BLB failed
to show the representations made by Walker were false when made.  Additionally, the
uncontroverted facts show Walker reasonably believed the information was true, based on
his experience and the market conditions at the time he made the representations to BLB.
Finally, it is doubtful the representations made by Walker are actionable as negligent
misrepresentations under Nebraska law, in any event, because the representations were
based on Walker's opinion regarding future values which were not susceptible to definite
knowledge.  This is particularly true where Walker clearly indicated the maintenance costs
were estimates based on particular maintenance examples and revenue was uncertain,
leading BLB to negotiate a particular lease payment based on a minimum number of flight
hours.  Additionally, Walker suggested Lee Bellue use national estimates for cost
projections rather than rely on Walker's experience.  TR. 153-154, 489-490, 598-601.
Finally, Walker acted reasonably by providing his opinions at BLB's request.  Accordingly,
BLB's claim for negligent misrepresentation must fail.

---

[2] Squawks are unscheduled maintenance problems found to need replacement or repair during a
routine inspection. TR. 342.

## C.    Breach of Contract

"In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." *Henriksen v. Gleason,* 643 N.W.2d 652, 658 (2002). A "contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms." *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 749 N.W.2d 124, 132 (Neb. 2008). "A breach is a nonperformance of a duty." *Id.* "In any damage action for breach of contract, the claimant must prove that the breach of contract was the proximate cause of the damages." *Sack Bros. v. Great Plains Co-op., Inc.*, 616 N.W.2d 796, 809 (Neb. 2000). "As a general rule, a party injured by a breach of contract is entitled to recover all damages which are reasonably certain and which are naturally expected to follow the breach." *Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 733 (Neb. 2000). "[T]he ultimate objective of a damages award is to put the injured party in the same position that the injured party would have occupied if the contract had been performed, that is, to make the injured party whole." *Centurion Stone of Neb. v. Trombino*, 812 N.W.2d 303, 309 (Neb. 2012).

### 1.    Lease Payments

BLB contends Jet Linx breached the Dry Lease Agreement by failing to pay BLB $47,100 for each month of N400GK's one-year lease.  **See** Filing No. 189 - Plaintiff's Closing p. 15; Filing No. 148 - PTO ¶¶ C(6), C(7).  BLB argues Jet Linx failed to make or made insufficient payments for four of the twelve months.  BLB contends Jet Linx failed to make any lease payment for August 2007.  Ex. 154; TR. 117.  Jet Linx does not dispute this allegation.  Jet Linx paid BLB $15,000 on October 26, 2007, credited toward the lease payment for September 2007.  Ex. 154.  BLB credited Jet Linx for $32,000 paid on August 8, 2008, toward the lease payments for June and July 2008.  Ex. 154.

The defendants argue BLB neglected to fulfill its own obligation under the Dry Lease Agreement by failing to provide Jet Linx with an operable aircraft until October 2008, thus relieving Jet Linx of its duty to make full payments.  **See** Filing No. 190 - Defendants' Closing p. 28-29.  Additionally, the defendants contend the contract did not actually require

monthly payments of $47,100 because maintenance and other charges were to be deducted. *Id.* at 29, 37. Finally, the defendants assert the parties modified the Dry Lease Agreement to allow reduced payments for the four months at issue. *Id.* at 36. Specifically, the defendants argue Lee Bellue accepted Walker's offer to pay a reduced lease payment of $15,000 for August and September 2007. *Id.* Similarly, the defendants contend Barry Bellue accepted Walker's offer to pay a reduced lease payment of $16,000 for June and July 2008. *Id.*

The Dry Lease Agreement provides, "[t]his Lease of aircraft is made effective as of August 1, 2007." Ex. 20 p. 1. The Dry Lease Agreement states, "[Jet Linx] guarantees [BLB] a minimum monthly lease payment of $47,100 per month, no matter the number of actual hours flown." Ex. 20 § 1 and Sched. A. The $47,100 amount is equal to 50 hours of flight time multiplied by a $942 hourly rate. *Id.* Sched. A. The Dry Lease Agreement anticipated flight time in excess of the initial 50 hours would be paid based on an hourly rate. *Id.* BLB delivered N400GK to Jet Linx in Omaha, Nebraska, on approximately August 24, 2007. **See** Filing No. 148 - PTO ¶ B(20); TR. 602. N400GK underwent additional maintenance and was available for its first revenue producing flight in October 2007. **See** TR. 602-603. The Dry Lease Agreement terminated by its own terms on July 31, 2008, without renewal. Exs. 20, 64.

"To successfully bring an action on a contract, a plaintiff must first establish that the plaintiff substantially performed the plaintiff's obligations under the contract." *VRT, Inc. v. Dutton-Lainson Co., 530 N.W.2d 619, 623 (Neb. 1995)*.

> Substantial performance is shown when the following circumstances are established by the evidence: (1) The party made an honest endeavor in good faith to perform its part of the contract, (2) the results of the endeavor are beneficial to the other party, and (3) such benefits are retained by the other party. If any one of the circumstances is not established, the performance is not substantial and the party has no right to recover.

*Id.*

The evidence presented at trial shows BLB made an honest effort to supply the defendants with N400GK in an operable and charter-worthy condition. BLB purchased

N400GK had repairs made, refurbished the interior, and delivered the aircraft on August 24, 2007.  BLB's conduct was in response to Jet Linx's request and beneficial to Jet Linx in terms of providing N400GK in an operable and charter-worthy condition.  The aircraft underwent additional unanticipated maintenance, paid for by BLB, at no fault to either party.  In any event, the parties would have reasonably been aware on June 20, 2007, when they executed the Dry Lease Agreement, that N400GK was not ready to begin charter service on August 1, 2007.  **See** Ex. 20.  Nevertheless, the Dry Lease Agreement stated it became effective on that date.  **Id.**  The Dry Lease Agreement makes no provision for delaying, suspending, or omitting payment under the lease until N400GK began making revenue producing charter flights.  Accordingly, Jet Linx retained the duty to pay BLB under the terms of the lease.

The defendants contend the parties modified the contract to reduce the lease payments owed for the four months at issue.  **See** Filing No. 190 - Defendants' Closing p. 35-36.  By its own terms, "any change or modification [to the Dry Lease Agreement] must be in writing and signed by both parties."  Ex. 20 - Dry Lease Agreement p. 7 § 13.  In any event, "where the modification of a contract substantially changes the liability of the parties, mutual assent is required."  ***Whorley v. First Westside Bank**, 485 N.W.2d 578, 581 (Neb. 1992).*  The evidence before the court is Lee Bellue sought payment under the Dry Lease Agreement in October 2007, reminding the defendants that he had to make monthly payments of $15,000 on his bank loan for N400GK.  TR. 82, 121.  In response, Jet Linx paid $15,000, however Lee Bellue did not agree to reduce Jet Linx's liability under the Dry Lease Agreement.  TR. 121, 158-160.  Walker testified at trial he negotiated with Lee Bellue to make a short payment of $15,000 until N400GK was available for revenue producing flights.  TR. 603-604.  Walker, who had also negotiated and signed the Dry Lease Agreement months earlier, remained under the misunderstanding that Jet Linx's lease payments were based on the number of charter hours flown, rather than the minimum flat rate of $47,100.  Ex. 82.  Accordingly, Walker agreed to make the $15,000 payment "in the spirit of the – the bigger partnership" as opposed to meeting an obligation under the Dry Lease Agreement.  **See** TR. 603.  As discussed in more detail above, the court finds Barry Bellue did not accept Walker's August 6, 2008, offer for reduced

18

payments for June and July 2008.  For these reasons, the court finds the parties did not modify the Dry Lease Agreement to decrease Jet Linx's lease payments.  Finally, the court will not reduce Jet Linx's obligation under the Dry Lease Agreement because there was the possibility costs would have been incurred to deduct from the lease payment, if N400GK had been flown in August and September 2007.  The defendants provided no proof costs were incurred during the period and the court will not speculate about costs which have no basis in fact.

Jet Linx breached the Dry Lease Agreement by failing to pay BLB $47,100 each month from August 2007 through July 2008.  The court finds, however Jet Linx's conduct was not arbitrary and capricious but based on incorrect but reasonable assumptions.  Jet Linx owes BLB $141,400 under the terms of the Dry Lease Agreement.

### 2.    Absence of Maintenance Documentation

BLB argues Jet Linx breached its obligations under the Dry Lease Agreement and MSA because Jet Linx failed to maintain maintenance records in accordance with applicable FAA regulations.  **See** Filing No. 148 - PTO ¶ C(10).  BLB argues because BLB lacked proper FAA required documentation, BLB would have to replace parts and redo maintenance for which Jet Linx did not maintain proper records.  **See** Filing No. 155 - Plaintiff's Trial Brief p. 18.  Further, BLB argues the missing records reduced the resale value of the aircraft.  **See** Filing No. 189 - Plaintiff's Closing p. 17.  BLB argues it suffered, according to Keith Flinn (Flinn), BLB's expert, $171,363.37 [3] in damages.  **_Id._** at 18; Ex. 156.

Jet Linx argues Flinn did not conduct an inspection in the same manner as a normal pre-buy inspection because Flinn did not review all records up to the date of Flinn's inspection, but only the records Jet Linx maintained.  **See** Filing No. 190 - Defendants' Closing p. 32.  Therefore, because Flinn did not perform an actual pre-buy inspection,

---

[3] $39,228.07 in damages for missing parts tags and $35,110.70 in damages for missing maintenance log documentation for work on N400GK.  **See** Filing No. 189 - Plaintiff's Closing p 18.  BLB argues it suffered $81,764.08 in damages for missing parts tags and $15,260.52 in damages for missing maintenance log documentation for work on N789DJ.  **_Id._**

Flinn's testimony lacks foundation. *Id.* at 32-33. Jet Linx also argues if Flinn had actually inspected the aircraft, Flinn could have verified whether parts tag were missing. *Id.* at 33. Jet Linx states under FAA regulations, records need only be maintained with an aircraft for one year or until the described work is superseded. *Id.* at 32. Jet Linx argues the alleged missing documents could have been properly discarded because either work was superseded or one year had passed between the time Jet Linx returned the aircraft to BLB and Flinn inspected the documents. *Id.* at 32. Lastly, Jet Linx argues, even assuming Jet Linx breached the contract for failing to maintain FAA required documentation, BLB's damages are speculative. *Id.* at 35, 37.

In response, BLB argues Flinn's failure to analyze maintenance records to the date of the inspection does not cast doubt on Flinn's conclusions that Jet Linx failed to properly maintain FAA required documents. **See** Filing No. 192 - Plaintiff's Reply p. 14. BLB argues a document review up to the inspection is unnecessary because the relevant time period is the time Jet Linx operated the aircraft. *Id.* at 14-16. BLB contends, for its breach of contract claim, whether the FAA required BLB to keep records after one year is irrelevant because Jet Linx had a contractual obligation to maintain FAA required documentation while Jet Linx operated the aircraft. *Id.* at 14-16. BLB argues because Jet Linx failed to maintain proper documents and provide BLB the documents, Jet Linx breached the contract. *Id.* BLB argues in a pre-buy inspection, the inspector does not verify parts by physically looking at the aircraft, as some parts are not accessible. *Id.* at 15. Lastly, BLB argues BLB's damages are not speculative because BLB suffered damages selling N400GK "as is," which necessarily contemplates a lower price than if a full pre-buy inspection was performed. *Id.* at 16.

Under the MSA, Jet Linx was responsible for "ensuring [N789DJ] complies with FAA maintenance requirements for accurate record entries." **See** Ex. 48 - MSA Ex. 1. In the PTO, the parties agreed Jet Linx would "ensure that all such maintenance work was accurately recorded in accordance with the Federal Aviation Regulations applicable to Jet Linx's operation [of N789DJ]." **See** Filing No. 148 - PTO ¶ B(26). Under the Dry Lease Agreement, the parties agreed:

> All inspection, repairs, modifications, maintenance, and overhaul work . . . will be performed in accordance with the standards set by the Federal Aviation Regulations. [Jet Linx] will maintain all log books and records pertaining to the Aircraft during the term of this Lease in accordance with the Federal Aviation Regulations. Such records will be made available for examination by [BLB], and [Jet Linx], at the termination of this Lease, will deliver such records to [BLB].

Ex. 20 - Dry Lease Agreement p. 5, § 7. Further, the parties agreed in the PTO that Jet Linx agreed "to maintain log books and records accurately reflecting the completion of such maintenance work during the term of the [Dry Lease Agreement] in accordance with the Federal Aviation Regulations." **See** Filing No. 148 - PTO ¶ B(18).

FAA regulation 91.417 requires an owner or operator "keep the following records . . . : Records of the maintenance, preventive maintenance, and alteration and records of the 100-hour, annual, progressive, and other required or approved inspections, as appropriate, for each aircraft (including the airframe) and each engine, propeller, rotor, and appliance of an aircraft." 14 C.F.R. § 91.417 (2012). The maintenance records "shall be retained until the work is repeated or superseded by other work or for 1 year after the work is performed." *Id.* Under the FAA regulations and the contracts, Jet Linx had a duty to maintain FAA required records for maintenance performed on N400GK and N789DJ during the time Jet Linx operated the aircraft.

Once the court determines a duty exists, the court must determine whether a breach, which "is a nonperformance of a duty," occurred. ***Phipps***, 610 N.W.2d at 730. Flinn reviewed aircraft records for maintenance performed from August 2007 to May 2008 (N400GK) and July 2007 to May 2008 (N789DJ). TR. 367:16-22. Flinn concluded FAA required documentation or part tags were missing for parts installed and maintenance performed on N400GK and N789DJ. TR. 325:25 - 359:7; Ex. 156. Allen King, Jet Linx's expert, testified, "[s]ome of [the documents] met the exact requirements . . . . Not all the documents I reviewed" and "some of the documents [he] reviewed were simple invoices." TR. 587:13-18; 588:2-10. Jet Linx's argument that Flinn failed to review records after the relevant time period is not persuasive. Additionally, Jet Linx's argument that parts or maintenance would have been superseded or the documents discarded because a year

had passed is not persuasive.  The relevant time period is the time Jet Linx operated the aircraft.  If Jet Linx failed to maintain the documents, then Jet Linx breached the contracts. BLB's contract claim alleges Jet Linx failed to maintain FAA required documentation during the time Jet Linx operated the aircraft.  Even if Flinn performed a pre-buy inspection and work was superseded or documents discarded, this court can still find Jet Linx breached the contract terms by failing to maintain FAA required documentation.  The evidence indicates Jet Linx failed to provide all FAA required documentation; therefore, the court finds Jet Linx breached its duty to maintain FAA required documentation for maintenance performed on N400GK and N789DJ.

Although Jet Linx's failure to provide proper documentation could cause damages, BLB fails to show BLB suffered damages.  Flinn testified "the effect of [the missing documentation or part tags is] hard to show during that 12-month period . . . without having the proper maintenance documentation, that the aircraft was maintained properly per [FAA regulations].  And it could have an effect on the value of the airplane."  TR. 359:19-24.  In order to rectify the lack of documentation or part tags, Flinn testified BLB would "either redo that maintenance task that you don't have a record for, or if you don't have a parts tag for you'd have to take the part and get it recertified or something like that to make sure you have airworthy components on the airplane."  TR. 360:3-7.  BLB has not proven the missing records diminished N400GK's value at sale.  Since an actual pre-buy inspection was not performed, there is no evidence indicating how much N400GK's value was diminished.  Although BLB sold N400GK "as is" and argues N400GK was sold at a lower price, there is only speculation as to how much BLB was damaged by selling N400GK "as is" instead of with a pre-buy inspection.  Further, BLB did not install new parts or redo maintenance because of missing documentation.  Similarly, BLB has not shown BLB installed new parts or performed maintenance again on N789DJ because of the missing maintenance documentation and there is no evidence the alleged missing documentation diminished N789DJ's value.  "Generally, while damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural."  ***Sack Bros. v. Great Plains Co-op., Inc.***, 616 N.W.2d 796, 809 (Neb. 2000).  "Damages which are uncertain, speculative, or conjectural cannot be a basis for

recovery." *Hitzemann v. Adam*, 518 N.W.2d 102, 107 (Neb. 1994).  BLB fails to show Jet Linx's breach caused BLB damages.  BLB's damages are speculative and therefore BLB fails to carry its burden and establish a breach of contract.

### 3.    Maintenance Costs

Jet Linx marked up costs for maintenance third parties performed on N789DJ by $15,774.67.  **See** Ex. 155.  BLB argues Jet Linx marked up the costs for maintenance and parts without a contractual basis under the MSA.  **See** Filing No. 192 - Plaintiff's Reply p. 16-17.  Additionally, BLB argues the parties did not reach a verbal agreement Jet Linx could mark up maintenance and parts expenses.  *Id.* at 17.  BLB also argues Jet Linx overcharged BLB for maintenance on N400GK in the amount of $6,778.50 by marking up the cost of work performed by outside vendors and charging more than $75 per hour for labor performed by Jet Linx maintenance personnel.  **See** Filing No. 189 - Plaintiff's Closing p. 19.

Jet Linx argues BLB agreed maintenance and parts could be marked up for N789DJ in exchange for the removal of a provision in the MSA requiring a maintenance reserve account.  **See** Filing No. 190 - Defendants' Closing p. 39-40.  Jet Linx references Barrett's deposition testimony wherein Barrett testified, "[he] believe[d] that because [Jet Linx and BLB] negotiated the operating expense fund out of the contract, . . . [Jet Linx] needed to have a markup on parts to make whole some of [Jet Linx's] costs."  *Id.* (**quoting** Barrett Depo. 44:19-24).  Jet Linx argues the MSA supports Barrett's testimony and the MSA neither prohibit nor specifically allow mark ups.  *Id.* at 40.

Jet Linx accurately states "[o]ne of the most well-established principles of Nebraska law is that once the parties reduce their agreement to a writing, that writing controls to the exclusion of any acts supposedly occurring prior to or contemporaneously with the signing of the agreement."  **See** Filing No. 190 - Defendants' Closing p. 18 (**citing** *R & B Farms, Inc. v. Cedar Valley Acres, Inc.*, 798 N.W.2d 121, 129-30 (Neb. 2011)).  "The parol evidence rule states that if negotiations between the parties result in an integrated agreement which is reduced to writing, then, in the absence of fraud, mistake, or ambiguity, the written agreement is the only competent evidence of the contract between [the

parties].”  *R & B Farms*, 798 N.W.2d at 129-30.   “The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement.”  *Par 3, Inc. v. Livingston*, 686 N.W.2d 369, 373-74 (Neb. 2004).   “[A] written contract which is expressed in clear and unambiguous language is not subject to interpretation or construction, and the intention of the parties must be determined from the contents of the document alone.”  *Lueder Const. Co. v. Lincoln Elec. Sys.*, 424 N.W.2d 126, 129 (Neb. 1988).

The MSA BLB and Jet Linx executed contains an “Entire Agreement” provision, which provides the agreement “contain[s] the entire understanding between Manager and the Owner . . . and neither party is relying on any prior . . . verbal agreements . . . .” Ex. 48, p. 10.  Further, the MSA states the “[a]greement may be amended but only on a written addendum executed by the Owner and Manager.” *Id.*  No such written addendum for mark up of costs was executed.  Additionally, Barrett’s testimony that he believed the parties negotiated mark ups in exchange for eliminating the operating expense fund is barred under the parol evidence rule and does not affect the terms of the MSA.  **See** *R & B Farms*, 798 N.W.2d at 129-30.

Jet Linx has a duty to comply with the terms of the MSA.  The MSA limits reimbursements to Jet Linx under MSA section 7.1, which provides, “[BLB] is responsible for reimbursing [Jet Linx] for services and supplies . . . .   Examples of reimbursable expenses are listed in Exhibit 3.”  **See** Ex. 48 - MSA p. 5.  MSA Exhibit 3, in part, sets forth the following as reimbursable expenses: “[r]outine and non-routine maintenance, including parts, supplies and base labor, periodic inspections and repairs, engine and component changes or additions, accessories or parts.”  *Id.* at 18 Ex. 3 ¶ g.  MSA Exhibit 3 does not include Jet Linx’s mark up costs.  Jet Linx breached its duty to comply with the terms of the MSA when Jet Linx, in contravention to the terms and without basis under the MSA, marked up of costs for maintenance and parts.  As a result, Jet Linx caused BLB to pay Jet Linx more than the MSA required.  BLB suffered $15,774.67 in damages, which represents the total amount overcharged due to Jet Linx’s mark ups on N789DJ.  **See** Ex. 155.  Therefore, BLB is entitled to $15,774.67 in reimbursement.

Jet Linx does not dispute it overcharged BLB for maintenance on N400GK by marking up the cost of work performed by outside vendors and charging more than $75 per hour for labor performed by Jet Linx maintenance personnel.  BLB suffered $6,778.50 in damages, which represents the total amount overcharged.  **See** Ex. 155.  Therefore, BLB is also entitled to $6,778.50 in reimbursement for mark ups on N400GK's costs.

Despite the court's finding Jet Linx breached the contract with regard to the maintenance costs, the facts do not support a finding that Jet Linx's billing practices significantly impaired the benefits BLB received under the MSA and Dry Lease Agreement.  **See _Spanish Oaks, Inc. v. Hy-Vee, Inc._**, 655 N.W.2d 390, 400 (Neb. 2003) ("A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract.").  Therefore, BLB's claim for breach of the covenant of good faith and fair dealing as listed in the PTO, fails.  **See** Filing No. 148 - PTO ¶ C(14).


D.    **Oil Loss Incident**

1.    **Breach of Contract**

Jet Linx asserts a counterclaim against BLB for charges incurred due to maintenance on N789DJ after the February 20, 2008, incident.  **See** Filing No. 148 - PTO ¶ B(39).  Jet Linx states the maintenance charges arise from the removal, tear-down, and remounting of N789DJ's engine.  **See** Filing No. 157 - Defendants' Trial Brief p. 8.  Jet Linx argues because the oil pressure dropped so low the engine had to be removed and torn down to determine the extent of damage.  **See** Filing No. 190 - Defendants' Closing p. 41.  Jet Linx argues BLB, pursuant to the MSA, is required to pay for maintenance.  _**Id.**_ at 40.  Additionally, according to Jet Linx, the invoiced amount began accruing interest as of January 20, 2009.  **See** Filing No. 152 - Statement of Jet Linx's Damages.  Therefore, with interest, Jet Linx alleges the amount due, as of January 24, 2012, is $240,972.84.  _**Id.**_

BLB argues the evidence demonstrates the oil loss incident and subsequent charges were the result of Jet Linx's pilots' negligence.  **See** Filing No. 189 - Plaintiff's Closing p. 34.  Therefore, BLB contends BLB is not responsible for the maintenance and repair charges.  **See** Filing No. 192 - Plaintiff's Reply p. 19.

The parties do not dispute the MSA governs Jet Linx's counterclaim for reimbursement. Under the MSA, BLB is required to reimburse Jet Linx for certain maintenance charges. Specifically, the MSA states:

> 7.1   REIMBURSEMENTS TO MANAGER. The Owner is responsible for reimbursing Manager for services and supplies (including insurance, if any) for the Aircraft, which are obtained or furnished by Manager on behalf of the Owner. Examples of reimbursable expenses are listed in Exhibit 3, of this Agreement.

Ex. 48 - MSA p. 5. Exhibit 3 sets forth the following:

> g)   Routine and non-routine maintenance, including parts, supplies and base labor, periodic inspections and repairs, engine and component changes or additions, accessories or parts.

*Id.* at 18. BLB's responsibility for maintenance services is limited under MSA section 10.2:

> 10.2   LIMITS OF LIABILITY. ***Manager does not assume any liability for damages*** caused by or resulting from, directly or indirectly, wholly or in part, any failure or fault ***other than its negligence***, willful misconduct or breach of contract in furnishing or omitting to furnish services under this agreement.

*Id.* at 8 (emphasis added).

The engine required maintenance because the oil in the engine fell below the minimum level required under the engine manufacturer's maintenance manual. **See** Filing No. 148 - PTO ¶ B(29). Due to the maintenance, Jet Linx incurred $158,014.98 in expenses. **See** Ex. 36. After the insurance claim was denied on December 30, 2008, on the same day, Jet Linx sent BLB an invoice for the full amount of expenses. *Id.* Under the MSA, BLB is "responsible for reimbursing [Jet Linx] for services and supplies." **See** Ex. 48 - MSA p. 5. An example of such services and supplies is non-routine maintenance for engine repairs. *Id.* at 8. Thus, pursuant to the terms of the MSA, BLB is obligated to reimburse Jet Linx for the $158,014.98, plus interest, unless the MSA excuses BLB from performance. BLB did not reimburse Jet Linx; however, BLB contends Jet Linx is responsible for the maintenance charges related to the oil loss incident because Jet Linx's negligence caused the incident, resulting in the required maintenance. Therefore, in order

to determine the party responsible for the maintenance charges, this court must determine whether Jet Linx was negligent in operating N789DJ on February 20, 2008.

### 2.     Negligence

BLB argues the damage to the engine was the result of pilot error and therefore BLB is not responsible for maintenance charges associated with the oil pressure incident. **See** Filing No. 155 - Plaintiff's Trial Brief p. 29. BLB argues Jet Linx agreed to assume liability for damages arising out of Jet Linx's negligence. *Id.* at 29-30. Jet Linx references the disciplinary action taken against Jet Linx's pilot, Clark, as evidence of Clark's negligence. *Id.* BLB further argues, even if the oil cap was cracked, there is no evidence the cracked oil cap caused the loss of oil. **See** Filing No. 189 - Plaintiff's Closing p. 37. BLB argues the cracked cap likely resulted from Clark's negligent failure to secure the cap. *Id.* at p. 37. Lastly, BLB argues, even if the engine started to leak because the oil cap was cracked, Clark was still negligent in failing to promptly shut down the engine when low oil pressure was indicated. *Id.* at 38. Therefore, BLB contends Jet Linx is responsible for the maintenance charges because Jet Linx's pilots were negligent when they did not check and secure the oil cap before the flight and failed to immediately shut down the engine when there was low oil pressure. **See** Filing No. 192 - Plaintiff's Reply p. 19.

Jet Linx argues there is no evidence of what caused the engine damage. **See** Filing No. 190 - Defendants' Closing p. 41. However, Jet Linx argues the evidence does show the pilots followed procedure and did not breach any duty. *Id.* at 41. Jet Linx argues "[t]here is nothing except speculation to show either that the pilot did not shut down the engine fast enough to prevent the oil loss or even if it was possible that shutting the engine down sooner would have prevented the oil loss." *Id.* at p. 6. Jet Linx states, although it first assumed pilot error caused the engine damage, after the tear-down inspection, Jet Linx learned the oil cap was cracked. **See** Filing No. 191 - Defendants' Reply p. 6.

"Ordinary negligence is defined as the doing of something that a reasonably careful person would not do under similar circumstances, or the failing to do something that a reasonably careful person would do under similar circumstances." ***Wilke v. Woodhouse Ford, Inc.*, 774 N.W.2d 370, 379 (Neb. 2009).** "In order to recover in a negligence action,

a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages." *Martensen v. Rejda Bros., Inc.*, 808 N.W.2d 855, 861-62 (Neb. 2012).   "One alleging negligence has the burden to prove such negligence." *Bargmann v. Soll Oil Co.*, 574 N.W.2d 478, 485 (Neb. 1998).  The court will address the elements of negligence *seriatim*.

### a.   Duty

"The question of what duty is owed and the scope of that duty is multifaceted." *Cerny v. Cedar Bluffs Junior/Senior Pub. Sch.*, 628 N.W.2d 697, 703 (Neb. 2001). "[W]hether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation." *Martensen*, 808 N.W.2d at 862. "As a general matter, the existence of a duty serves as a legal conclusion that an actor must exercise that degree of care as would be exercised by a reasonable person under the circumstances." *Id.* at 863.  "Once a court determines that a duty is owed by one party to another, it becomes necessary to define the scope and extent of the duty.  In other words, the necessary complement of duty-the standard of care-must be ascertained." *Cerny*, 628 N.W.2d at 703.

> In the absence of statutes covering the operation and management of airplanes at the time and place of an accident, specifically applicable to the issue of negligence in the operation thereof, the rules of law applicable to torts – the ordinary rules of negligence and due care – obtain.  Thus, the rule of the common law that every person shall use ordinary care not to injure another, that is, such care as the great mass of mankind would use under the same or similar circumstances or such care as the ordinarily prudent person would use under the same or similar circumstances, applies.  An aviator is under no duty to use the highest degree of care that men of reasonable diligence or foresight ordinarily exercise in the operation of airplanes, but is bound only to use ordinary care, although here, as in any other case, ordinary care differs under the circumstances.

*In re Kinsey's Estate*, 40 N.W.2d 526, 531-32 (Neb. 1949); **see also** *Scarborough v. Aeroservice, Inc.*, 53 N.W.2d 902, 909 (Neb. 1952).

The parties have not provided a statute, regulation, or other ordinance that imposes on the pilots the duty to check the oil cap prior to takeoff or immediately shut down the engine upon illumination of the low oil pressure light.  However, Jet Linx employees testified to certain procedures pilots follow at Jet Linx.  Specifically, Boatwright testified that as part of the pre-flight inspection, the pilots "are required to check the oil quantity, which requires removal of the oil cap and reinstallation."  **See** TR. 284:21 - 285:2.  Kopp and Smith also testified flight procedure requires the pilots to check the oil level and oil cap security before takeoff.  **See** TR. 400:18-25; 416:15-25; 417:1-4.  With regard to shutting down the engine when oil loss is indicated, Kopp testified there are no written procedures, but when faced with loss of oil pressure, the pilots should "instantly" shut down the engine. **See** TR. 405:7-12.  Smith further testified if the low oil pressure light illuminates, standard procedure would be to follow the appropriate checklist for the malfunction, which includes shutting down the engine.  **See** TR. 417:7-18.  Smith testified it is not standard procedure to call the director of maintenance when the low oil pressure light illuminates.  **See** TR. 417:19-23.  Lee Bellue testified if a pilot has zero oil pressure the pilot should immediately shut down the engine.  **See** TR. 126:15-20.

Therefore, in light of the testimony, the court finds Jet Linx's pilots had a duty to follow procedures in operating N789DJ by conducting a pre-flight inspection of the engine and shutting down the engine upon illumination of the low oil pressure light.

### b.    Breach

Once a legal duty is shown, the party alleging negligence must prove such duty was breached. ***Martensen***, 808 N.W.2d at 861-62.  "[T]he ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact." ***Cerny***, 628 N.W.2d at 704.  "To resolve the issue, a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard." ***Cingle v. Neb.***, 766 N.W.2d 381, 389 (Neb. 2009).

BLB argues Jet Linx's internal documents, including the pilots' statements, and Jet Linx's employees' testimony demonstrate Jet Linx's pilots' negligence caused the oil loss

incident and resulting maintenance.  **See** Filing No. 189 - Plaintiff's Closing p. 34.  BLB argues Jet Linx's disciplinary action of Clark after the oil loss incident is indicative of Clark's negligence wherein Kopp concluded "Clark and his associated Co-Pilot failed to ensure proper security of the engine oil cap, and then failed to promptly shut the engine down when low oil pressure was indicated."  **_Id._** (**quoting** Ex. 3).  Jet Linx argues the pilots' statements establish the pilots followed procedure and, therefore, did not breach any duty.  **See** Filing No. 190 - Defendants' Closing p. 41.

Boatwright, Kopp, and Smith all testified standard procedure required the pilots to conduct a pre-flight inspection, which included checking and securing the oil cap.  According to Clark's and Montanye's statements, neither pilot inspected N789DJ's engine on the morning of February 20, 2008.  **See** Ex. 1, 2.  Clark's Employee Disciplinary Report Form, which Clark did not dispute for accuracy, confirms "the oil and oil cap security [were] not checked on the day of the planned departure."  **See** Ex. 3.  Therefore, Jet Linx's pilots breached their duty when the pilots failed to perform a pre-flight inspection of the engine in accordance with standard procedure.

The evidence regarding the pilots' actions after the engine lost oil pressure indicates there were seconds of delay between the loss in oil pressure and the port-side engine shut down.  The pilots' statements show once the low oil pressure light illuminated, Clark informed Montanye, who then immediately called the flight control tower and Boatwright.  Ex. 1, 2.  Montanye indicated to Boatwright the oil pressure dropped rapidly and asked whether Clark and Montanye should shut down the engine.  **See** TR. 280:7-11.  Boatwright told Montanye to "absolutely" shut down the engine.  **See** TR. 280:13.  The engine was not shut down until after Boatwright's instruction.  TR. 280:12-22; 325:7-17.  Boatwright testified he told Montanye to shut down the engine because damage can occur to an engine without oil pressure.  **See** TR. 280:14-16.

According to Smith, the pilots should have shut down the engines once the oil pressure light illuminated.  **See** TR. 417:7-18.  Kopp also testified the pilots should have shut the engine down "instantly" as soon as there was low oil pressure.  **See** TR. 405:7-23.  However, Kopp also testified there could be reasons for leaving the engine running temporarily such as traffic or other circumstances.  **See** TR. 403:23 - 404:6.  Kopp testified

a pilot might need to exit the runway before shutting down the engine to get clear from traffic.  **See** TR. 397:1-10.  Additionally, Kopp testified pilots have an obligation to follow the flight tower's instructions in a timely manner.  **See** TR. 410:14-18.  Boatwright testified, according to the information he received, N789DJ was on an active runway and needed to get off immediately.  **See** TR. 288:14-17.  By contrast, Lee Bellue testified under the circumstances Jet Linx's pilots were in, the pilots should have immediately shut down the engine.  **See** TR. 126:15-24.  Lee Bellue testified once a controller provides a pilot with an active runway, it is the pilot's runway until the pilot can safely exit.  **See** TR. 128:7-20.

In the Employee Disciplinary Report Form, Kopp noted Clark "failed to promptly shut the engine down when low oil pressure was indicated."  **See** Ex. 3.  Further, Kopp noted, "[t]he lack of proper preflight and operational procedures in an abnormal situation caused the need for engine removal and inspection as well as generator replacement due to oil damage.  This has resulted in significant avoidable expense to the company."  *Id.*  Additionally, Clark was demoted, in part, due to "a delay in engine shutdown when low oil pressure was indicated."  **See** Ex. 4.

In light of the evidence, the court concludes Jet Linx's pilots breached their duty when the pilots failed to promptly shut down the engine when the low oil pressure light illuminated.  The pilots' own statements and the disciplinary reports establish Jet Linx's pilots failed to immediately shut down the engine pursuant to standard procedure.  There is no evidence of extenuating circumstances to show the pilots had reason to delay in shutting down the engine.  Although there is testimony the pilots are obligated to follow the flight tower's instructions, there is no indication the pilots were required to immediately evacuate the runway to justify keeping the engine running.  Therefore, Jet Linx's pilots breached their duty to follow procedures in operating N789DJ when the pilots failed to immediately shut down the engine when the low oil pressure light illuminated.

### c.    Cause

"A proximate cause is a cause that (1) produces a result in a natural and continuous sequence and (2) without which the result would not have occurred."  ***Staley v. City of Omaha***, 713 N.W.2d 457, 466 (Neb. 2006).  "A defendant's conduct is a proximate cause

of an event if the event would not have occurred but for that conduct, but it is not a proximate cause if the event would have occurred without that conduct." *Worth v. Kolbeck*, 728 N.W.2d 282, 290 (Neb. 2007). The proximate cause does not have to be the sole cause, but only a proximate cause. **See** *Meyer v. State*, 650 N.W.2d 459, 463 (Neb. 2002) (concluding "actions of a [party] be merely a proximate cause of the damage, and not the sole proximate cause").

The decrease in oil pressure caused the engine damage; however, there is no evidence negligence caused the decrease in oil pressure. Although the pilots failed to conduct a pre-flight inspection on February 20, 2008, there is no evidence this failure was the "but for" cause of the decrease in oil pressure. The evidence does show that on February 19, 2008, Clark checked N789DJ's engine and "pulled the cap on the port engine to find the oil in acceptable levels and replaced the cap and pushed the cap closing trigger in the down position . . . ." **See** Ex. 1. Clark did not note the cap was loose or cracked. Upon checking the engine after the decrease in oil pressure on February 20, 2008, Clark noted the "oil fill cap on the port engine . . . is still in place, trigger down, but loose." **See** Ex. 1. Dallas Airmotive noted "the oil filler cap exhibited cracking in the top locking feature of the assembly." **See** Ex. 101. Dallas Airmotive concluded the probable cause of distress was from "[l]oss of oil from the engine [due] to a loose filler cap during engine runs in the field." *Id.*

The aforementioned evidence establishes the pilots failed to inspect the engine before takeoff on February 20, 2008, and there was a crack in the oil cap; however, the evidence does not establish a causal link or a sequence of events which led to the subsequent decrease in oil pressure. When the pilots inspected the engine on February 19, 2008, the pilots did not note an issue with the oil cap. There is no evidence to suggest how the engine lost oil pressure between the time the pilots inspected the engine and the time of the loss in oil pressure. Further, there is no evidence the engine lost oil pressure *because* the pilots failed to conduct a pre-flight inspection on February 20, 2008. Therefore, the pilots' failure to conduct a pre-flight inspection on February 20, 2008, is not the "but for" cause of the decrease in oil pressure.

32

In addition to the court's finding negligence did not cause the decrease in oil pressure, the court also finds the pilots' delay in shutting down the engine did not cause the engine damage.  There is no evidence the delay in shutting down the engine increased the severity of the engine damage.  In fact, once Montanye observed the low oil pressure light illuminated, she noted the oil pressure gauge already read zero.  **See** Ex. 2.  This suggests the damage to the engine had already occurred, thus the delay in shutting down the engine did not cause additional damage.  Although the pilots' and Boatwright's statements establish the pilots delayed in shutting down the engine, the evidence does not establish a causal link between the pilots' delay in shutting down the engine and the subsequent damages due to the decrease in oil pressure.

Jet Linx's pilots did not negligently cause the decrease in oil pressure which resulted in substantial damages to N789DJ's engine on February 20, 2008.  The MSA provides, in the absence of Jet Linx's negligence, BLB is required to reimburse Jet Linx for maintenance on N789DJ.  According to Jet Linx, the invoiced amount began accruing interest as of January 20, 2009.  **See** Filing No. 152 - Statement of Jet Linx's Damages.  Therefore, with interest accruing until January 24, 2012, Jet Linx asserts the amount due is $240,972.84.  *Id.*  "Prejudgment interest . . . is recoverable when the claim is liquidated . . . ."  *Countryside Co-op. v. Harry A. Koch Co.*, 790 N.W.2d 873, 889 (Neb. 2010).  However, "[w]here reasonable controversy exists as to the plaintiff's right to recover or as to the amount of such a recovery, the claim is considered to be unliquidated and prejudgment interest is not allowed."  *Langel Chevrolet-Cadillac, Inc. v. Midwest Bridge & Const. Co.*, 329 N.W.2d 97, 101 (Neb. 1983).  BLB reasonably disputed Jet Linx's right to recover.  As such, Jet Linx's claim is unliquidated and prejudgment interest is not recoverable.  Therefore, BLB is required to reimburse Jet Linx $158,014.98.

**IT IS ORDERED:**

1.      Judgment will be granted in favor of BLB and against Jet Linx for breach of contract in the amount of $141,400 for unpaid lease payments and in the amount of $22,553.17 for overpaid maintenance costs.  Judgment will be granted in favor of the defendants and against the plaintiff on the plaintiff's remaining claims.

2.      Judgment will be granted in favor of Jet Linx and against BLB for breach of contract in the amount of $158,014.98 for maintenance costs resulting from the oil loss incident.

3.      The defendants' oral motion for judgment as a matter of law is denied.

DATED this 27th day of September, 2012.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.