IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BLB AVIATION SOUTH CAROLINA, LLC, | |
| Plaintiff, | 8:10CV42 |
| vs. | ORDER |
| JET LINX AVIATION CORPORATION, JAMIE WALKER, JET LINX AVIATION LLC, and JET LINX MANAGEMENT COMPANY, LLC, | |
| Defendants. | |

This matter is before the court to analyze whether the defendants' breach of contract entitles BLB Aviation South Carolina, LLC (BLB) to damages, specifically addressing both cost-of-repair and diminution of value theories of damages. After partial remand from the United States Court of Appeals for the Eighth Circuit, the parties filed post-appeal briefs (Filing Nos. 210 and 211) and reply briefs (Filing Nos. 212 and 231) regarding damages.

## BACKGROUND

In 2007, BLB, an aviation company, and Jet Linx Aviation, LLC, Jet Linx Aviation Corporation, and Jet Linx Management Company, LLC (collectively Jet Linx), an aircraft charter business, entered into two separate agreements for Jet Linx to use two BLB aircraft for charter flights. Both agreements required Jet Linx to perform maintenance "in accordance with the standards set by Federal Aviation Regulations" and "maintain all log books and records . . . in accordance with the Federal Aviation Regulations." Ex. 20 - Dry Lease Agreement p. 5, § 7; **see** Ex. 48 - Management Services Agreement Ex. 1. Upon termination of the agreements, Jet Linx delivered maintenance records to BLB; however, Federal Aviation Administration (FAA) required documentation or part tags were missing for parts installed and maintenance performed on the aircraft.[1]

---

[1] There is no dispute the maintenance was completed and the aircraft were airworthy. **See** TR. 194.

Accordingly, the court found Jet Linx breached its duty to maintain the records during the term of the agreements. **See** Filing No. 193 - Order p. 22.

The parties tried this case to the undersigned magistrate judge February 6-8, 2012, after consent pursuant to 28 U.S.C. § 636.[2] During trial Keith Flinn (Flinn) testified BLB suffered a total of $171,363.37 in damages due to Jet Linx's breach. This total represents $39,228.07 in damages for missing parts tags and $35,110.70 in damages for missing maintenance log documentation for work on aircraft N400GK and $81,764.08 in damages for missing parts tags and $15,260.52 in damages for missing maintenance log documentation for work on aircraft N789DJ. These amounts represent the aggregate Jet Linx billed BLB for maintenance work, which was unaccompanied by appropriate documentation. **See** Filing No. 210 - Brief p. 3. Flinn testified the damages are associated with ensuring the aircraft has airworthy components and the owner may have to repeat maintenance or recertify parts associated with missing documentation and parts tags, which may reduce an aircraft's resale value. **See** TR. 246-249, 360. BLB argues it proved undisputed cost-of-repair damages in the amount of $171,363.37 at trial. **See** Filing No. 210 - Brief p. 1. BLB further argues Jet Linx failed to prove the elements required to employ the diminution in value method to calculate damages. *Id.* at 2-3.

Jet Linx argues Flinn's damage amounts are speculative because BLB never completed any additional maintenance, had any concerns with the safety of the either aircraft because of the lack of documentation, or proved additional maintenance or recertification was necessary. **See** Filing No. 211 - Brief p. 5-9; Filing No. 213 - Reply Brief p. 1-3. Additionally, Jet Linx argues Flinn's damage amounts are speculative because BLB failed to prove the missing records diminished either aircraft's value and sold aircraft N400GK "as is" without undergoing a presale inspection. *Id.*

## ANALYSIS

In Nebraska, the plaintiff has the initial burden of offering evidence sufficient to prove damages. **See** ***Bedore v. Ranch Oil Co.***, 805 N.W.2d 68, 86 (Neb. 2011).

---

[2] The trial transcript is contained in three consecutively paginated volumes at Filing Nos. 184, 185, and 186. The court will cite to the transcript using the abbreviation TR. followed by the specific page number referenced.

"Generally, while damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural." ***Sack Bros. v. Great Plains Co-op., Inc.***, 616 N.W.2d 796, 809 (Neb. 2000). "Damages which are uncertain, speculative, or conjectural cannot be a basis for recovery." ***Hitzemann v. Adam***, 518 N.W.2d 102, 107 (Neb. 1994); **see** ***American Cent. City, Inc. v. Joint Antelope Valley Authority***, 807 N.W.2d 170, 181 (Neb. 2011). "Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery." ***Sack Bros.***, 616 N.W.2d at 809. Proof of damages "is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness." ***Pribil v. Koinzan***, 266 Neb. 222, 227 (Neb. 2003); **see** ***Lesiak v. Central Valley Ag Co-op., Inc.***, 808 N.W.2d 67, 76-77 (Neb. 2012) ("require[ing] enough evidence to provide a reasonable basis for the jury to estimate the extent of the damage").

"The principle underlying allowance of damages is to place the injured party in the same position, so far as money can do it, as he or she would have been had there been no injury or breach of duty, that is, to compensate for the injury ***actually sustained***." ***J.D. Warehouse v. Lutz & Co.***, 639 N.W.2d 88 (Neb. 2002) (emphasis added). "The measure of damages in the case of a breach of contract is the amount which will compensate the injured party for the loss which the breach has entailed." ***Fink v. Denbeck***, 293 N.W.2d 398, 401 (Neb. 1980). A "property owner's damages . . . is always the sum which will put him or her in as good a position as if the contract had been performed. . . . [U]sually this will be based on the cost to remedy any defect, rather than the diminution in value between the performance rendered and that promised." 24 WILLISTON ON CONTRACTS § 66:17 (4th ed. 2014); **see** ***Moss v. Speck***, 306 N.W.2d 156, 157 (Neb. 1981). However, "[w]hich measure of damages is to be applied, i.e., cost of repairs or difference in value with or without defect or injury, depends upon the evidence in the particular case." ***Fink***, 293 N.W.2d at 401-02. A sum sufficient to make reasonable repairs fully compensates an injury, nevertheless "the measure is the loss sustained and includes cost of repairs ***not exceeding*** the diminution in value." ***Id.*** at 402 (emphasis added). Since either measure of damages appropriately compensates the property owner, the rationale behind presuming cost-of-repair damages supposes the cost to complete defective performance will be lower than

the difference in value between the property as promised and with the defect.  **See** *id.*; 24 WILLISTON ON CONTRACTS § 66:17.  Accordingly, diminution in value is only inferior to the cost-of-repair as a measure of damages on the assumption it may result in higher damages thereby unreasonably overcompensating the property owner.  In any event, the amount of the property's diminution in value is indispensable to either calculation.  **See** *Fink*, 293 N.W.2d at 402; *Moss*, 306 N.W.2d at 158 (finding property was "totally without value" absent repair and no evidence existed the cost of repair was "unreasonable or inordinate").

The diminution in value approach, as noted by the Nebraska Supreme Court in *Moss*, "contemplates instances where the contract has been substantially complied with, the structure as completed will serve substantially as well as would the structure if completed according to contract, and completion in accord with the contract terms would either endanger . . . the structure or be possible only at inordinate cost."  *Moss*, 306 N.W.2d at 158 (**citing** 5 A. CORBIN, CONTRACTS § 1089 (1964)).  This cost, the disparity between the cost of repair and a relatively lower diminution in value, is economic waste.  *Id.*; **see** 24 WILLISTON ON CONTRACTS § 66:17.

> [I]n order to demonstrate that the cost of cure mounts up to economic waste, considerable weight must be given to any difference between the value of the property after the corrective work is done with the value of the property absent the corrective work.  That difference is then compared to the cost of cure.

*Andrulis v. Levin Const. Corp.*, 628 A.2d 197, 207 (Md. 1993); **see** *Smith v. Erftmier*, 315 N.W.2d 445, 450 (Neb. 1982).  The breaching party bears the burden of demonstrating a cost-of-repair damage award would amount to an "unreasonable economic waste."  *Moss*, 306 N.W.2d at 158 (**quoting** 5 A. CORBIN, CONTRACTS § 1089 at 488); **see also** *Andrulis*, 628 A.2d at 208 (noting "the burden to show that the cost of correction constitutes economic waste is on the party breaching the contract").  "[T]he award for such [restoration] damage may not exceed the market value of the property immediately preceding the damage."  *Keitges v. VanDermeulen*, 483 N.W.2d 137, 143 (Neb. 1992).  If the breaching party fails to present evidence of the value of the property, but the owner has produced evidence of cost of repair, "the cost of repair or replacement is the appropriate damages measure."  *Stom v. Saint Clair Corp.*, 153

4

S.W.3d 360, 364 (Mo. Ct. App. 2005); see *Matt Miller Co., Inc. v. Taylor-Martin Holdings, LLC*, 393 S.W.3d 68, 84 (Mo. Ct. App. 2012).

A.   **Cost of Repair**

BLB asserts it has proven it suffered a total of $171,363.37 in cost-of-repair damages due to Jet Linx's breach. **See** Filing No. 212 - Reply p. 1. BLB contends cost-of-repair damages are appropriate under the circumstances because the missing documents have a detrimental effect on the value of the planes and Jet Linx failed to provide something BLB already paid for -- the documents, a service BLB did not receive. *Id.* at 5.

Cost-of-repair damages constitute "the cost to remedy any defect" occasioned by breach of contract or deficiency in performance. **See** 24 WILLISTON ON CONTRACTS § 66:17; **see also** *Moss*, 306 N.W.2d at 157 ("cost of remedying the defects"). The defect in this case is Jet Linx's failure to provide parts tags and documentation for maintenance and parts. **See** Filing No. 210 - Brief p. 3; TR. 361-362; Ex. 156. There is no dispute Jet Linx provided the underlying maintenance and parts. **See** TR. 194.

At trial, BLB sought to prove damages through the testimony of its expert witness, Flinn, and manager Barry Lee Bellue, Jr. (Lee Bellue). Flinn testified he is self-employed conducting aviation consulting by, for example, helping customers purchase aircraft, primarily conducting pre-buy inspections. **See** TR. 330, 338-347. Prior to his work as a consultant, Flinn attended classes in aviation, including accident investigation and appraisals, and Flinn worked to monitor aircraft maintenance compliance, with document completion and retention, and technical operations and engineering. **See** TR. 331-338. BLB asked Flinn to analyze the aircraft records in this case for the purpose of determining whether BLB had been overcharged for parts and maintenance. **See** TR. 352-353, 483; Ex. 98. BLB sent him a couple of notebooks, the maintenance manual, and the two agreements. *Id.* The notebooks contained the maintenance records, parts tags, Jet Linx transaction forms, and invoices for the period July 2007 to May 2008, when Jet Linx had possession of the aircraft. **See** TR. 353, 359, 362, 367, 389; Ex. 156. The invoices appeared to be those sent to BLB from Jet Linx for maintenance and repair to the aircraft. **See** TR. 357. The invoices were insufficient to comply with Federal Aviation Regulations (FAR) maintenance record requirements. **See** TR. 368-

369.  Flinn compared the maintenance record (also called logbook) entries with the parts tags and invoices.  **See** TR. 356-358.  The FAA requires maintenance entries in a logbook.  **See** TR. 358.  Parts tags or certificates of conformity are FAA required to show parts installed on an airplane are airworthy.  **See** TR. 358.  The FAA requires an aircraft's owner to maintain "life-time limited" or "overhaul" component records for the life of the aircraft.  **See** TR. 372.  Flinn identified items on the invoices for which he could not find corresponding logbook entries and parts tags.  **See** TR. 359.

Flinn "just used the numbers that Jet Linx charged [BLB] for certain either parts or tasks that [he] couldn't find records for.  And [he] added those up on some charts in [his] report."  **See** TR. 361-362; Ex. 156.  Flinn's charts comprise five pages.  **See** Ex. 156.  The last page merely combines the total for each previous page.  *Id.*  The first four pages each depict a spreadsheet listing a month with year in the left side column, a description of the maintenance, part, or invoices found lacking corresponding logbook entries in the center column, and an amount in the right side column.  *Id.*  Flinn determined BLB was invoiced for $171,363.37 for which there are not corresponding logbook entries or parts tags.  *Id.*  Flinn did not know whether BLB paid all of the invoices or the records might appear more accurate if the invoices were broken down with more specific details.  **See** TR. 374.  Flinn determined some of the records were insufficient because they did not comply with Jet Linx's own maintenance manual when the Jet Linx form did not contain a return to service notation not otherwise required by the FAA.  **See** TR. 375-378.  Flinn admitted Jet Linx's maintenance manual requirements would not be relevant to a pre-buy inspection.  **See** TR. 378.  Subsequent to his records review and chart preparation, Flinn was shown maintenance records and parts tags, which he admitted would comply with FAA regulations, but were not in the records he had reviewed.  **See** TR. 374-375 (e.g., an igniter and a starter generator). Flinn responded to Jet Linx's expert's report by listing eighty-two complying documents provided to him after his initial report, but did not incorporate into his charts any of the maintenance records (or corresponding cost figures) which were not part of his original review.  **See** TR. 366-367; Ex. 118.

Flinn testified that failure to maintain proper maintenance documentation makes it difficult to show an aircraft was maintained properly pursuant to the FAR, which "could have an effect on the value of the airplane."  **See** TR. 359.  The "direct effect on the

value of an airplane" . . . "is basically whatever the cost is to correct whatever the deficiencies are." **See** TR. 360. A party may rectify the lack of documentation or part tags by "either redo[ing] that maintenance task that you don't have a record for, or if you don't have a parts tag for you'd have to take the part and get it recertified or something like that to make sure you have airworthy components on the airplane." **See** TR. 360. Although not commonly seen by Flinn, a person may physically inspect aircraft parts for make and model to compare the data to the type certificate data sheet or catalog in order to certify the maintenance or repair. **See** TR. 380-381.

Flinn limited his records review to the period of Jet Linx's possession and did not examine the aircraft or assess any maintenance records either before or after that period. **See** TR. 389, 370. Flinn admitted more recent properly documented maintenance service would supersede the need to maintain the records for the prior task. **See** TR. 378-379. Flinn did not determine if later maintenance superseded the maintenance or repairs with missing documents. **See** TR. 389. Flinn admitted however, a normal pre-buy inspection accounts for the maintenance over the life of the aircraft. **See** TR. 367, 384. When asked if he would have disclosed the maintenance deficiencies in this case to the buyer of the aircraft N400GK, Flinn stated, "I'm not sure I would have or not." **See** TR. 385.

BLB continued operating both aircraft after they had been returned by Jet Linx without amending logbooks, conducting corrective maintenance, or recertifying parts. **See** TR. 166, 171, 195, 475-476, 481. Lee Bellue explained when BLB received aircraft N400GK from Jet Linx, it "was running okay at that time," and BLB never knew of any maintenance document deficiencies on either plane until Flinn said deficiencies existed. **See** TR. 171, 194-195, 483. Although Lee Bellue testified accurate maintenance records are "important for the next owner to make sure the airplane has been complied with for the manufacturer's specifications and all maintenance required has been taken care of," BLB did not disclose the deficiencies identified by Flinn to aircraft N400GK's buyer. **See** TR. 142, 146-147, 480-481. Lee Bellue sold aircraft N400GK, on January 15, 2012, "as is" without conducting a formal pre-buy inspection. **See** TR. 143-44; Ex. 162. The record contains aircraft N400GK's sale price, but does not contain any other relevant market value information about either aircraft. **See** Ex. 162.

7

Allen E. King (King), who worked with the FAA for twenty-eight years, in part as an airworthiness inspector, testified as an expert witness on behalf of Jet Linx. **See** TR. 574-576. King reviewed two boxes of records, Flinn's report, and parts of the FARs. **See** TR. 577-578; Exs. 103 and 116. An aircraft is considered airworthy if it is "in conformity to its type design and it has to be in a condition for safe operation." **See** TR. 581. The FAR does not require a particular type of logbook, but does require that maintenance action records are kept for one year or until the work is superseded or repeated and certain "life-limited" parts documents are kept with the airplane throughout its service life. **See** TR. 582. Aircraft parts are issued with a tag or certificate certifying the part meets material and manufacturing requirements to enable the installer to determine the eligibility of the part prior to its installation. **See** TR. 583-584. Aside from the tags, a type certificate date sheet, illustrative parts catalogs, aircraft equipment lists, and physical inspection or review of an invoice containing the make and model of the part may also determine eligibility for certification. **See** TR. 584-585. There is no regulation requiring that every part on an aircraft have a tag. **See** TR. 584.

King determined the records Flinn reviewed were maintenance action records, which could be disposed of after the part or work had been superseded or one year after installation. **See** TR. 589-590; Ex. 103. Additionally, in contrast to Flinn's opinions, King determined the original records or subsequently recovered records contained sufficient documentation to comply with FAR requirements for much of the maintenance and many of the parts. **See** TR. 589-590; Exs. 103 and 116. King acknowledged incomplete maintenance records could affect the sale of an aircraft, but does not believe the maintenance records in this case would affect the sale of the aircraft. **See** TR. 593-594. King opined the existence or deficiency of maintenance records in this case would not affect the air worthiness or value of the aircraft because the particular records need not be maintained after one year of the maintenance or installation of parts, none of which were life-limited parts, in any event. **See** Ex. 103.

BLB failed to prove with sufficient certainty it was actually injured by Jet Linx's breach. BLB failed to prove any amount of loss which the breach entailed. Evidence of past cost of maintenance and repairs insufficiently establishes the sum required to remedy the breach. Such amount does not reasonably provide the basis to determine the amount of BLB's actual or estimated damages caused by the breach. As an initial

matter, BLB would realize an appreciation in value, which could be offset against Jet Linx's liability, for example repeating maintenance or installing new parts several years after the initial work was completed increases the work's benefit to BLB. Nevertheless, BLB did not incur any maintenance or parts-related expenses due to the breach. BLB seeks compensation in an amount equal to the original invoices from Jet Linx for the maintenance and parts, which invoices did not correspond to maintenance records or parts tags in a container given to BLB by Jet Linx upon return of the aircraft in 2008. BLB flew both aircraft after they were returned from Jet Linx, unaware of any logbook or parts tags deficiencies until Flinn identified the issue in 2011. In 2011, Flinn analyzed records for a period in only 2007 and 2008; three years before BLB sold aircraft N400GK. Flinn failed to take into account whether BLB actually paid the invoices. Similarly, while Flinn separated labor overcharge amounts, he did "not figure in any mark-ups" when determining the dollar amounts. **See** TR. 387; Exs. 98, 156. The court previously awarded BLB damages for overpaid maintenance costs in the amount of $22,553.17, unrelated to the breach for failure to maintain records. **See** Filing No. 193 - Order. The record is unclear whether the amounts relied upon by Flinn from the invoices include or exclude an amount for the overcharged parts. Also, Flinn's report, even the supplemental report, does not account for the maintenance and parts documents located after his initial review.

In any event, by the time BLB became aware the documents they had received in 2008 were deficient, the documents had become obsolete. The FAA no longer required retention of the maintenance action records because over one year had passed and some of the maintenance had likely been repeated. The court credits King's opinion about the length of time an owner or operator was required to maintain the records. Flinn does not dispute this time frame, he opined only that Jet Linx's failure to provide the documents in 2008 was a breach of the parties' agreements. Remedying the breach in 2014 by retroactively creating a box of 2008-compliant but now obsolete records by any means is nonsensical. *Fink*, 293 N.W.2d at 401 ("[T]he law does not require the doing of a useless act.").

Furthermore, the airworthiness of the aircraft was not in doubt. BLB received the benefit of the maintenance and part installations completed. None of the maintenance had to be repeated or parts reinstalled due to the document deficiency. Many of the

missing documents were located as part of this lawsuit, obviating the need to recertify parts or unnecessarily repeat maintenance. Although not relevant to whether Jet Linx breached the agreements, the subsequently located maintenance records and parts tags are relevant to the damage calculation because they directly impact whether additional expenses were necessary to remedy the breach. In fact, the cost to remedy the defect of missing documents was not solely to repeat maintenance and part installation, other possibilities, at lower cost existed, such as locating documents (which was done) and conducting a visual inspection of the aircraft. The court credits King's testimony regarding the options available to remedy inadequate document retention, which testimony Flinn did not refute. For these reasons, BLB fails to show cost-of-repair damages are appropriate in this case.

### B.  Diminution in Value

As an alternative damage calculation, BLB argues the aircraft values deteriorated as a result of Jet Linx's deficient records and part tags preservation. **See** Filing No. 212 - Reply Brief p. 4-5. BLB's argument relies on a diminution in value theory of damage recovery. Although the burden is generally on the breaching party to demonstrate diminution in value, Jet Linx has no incentive in this case to present any evidence on diminution in value. BLB does.

Cost-of-repair damages, as found by the court in this case, would not result in unreasonable economic waste. By contrast, cost-of-repair damages as calculated by BLB would result in economic waste because it would unreasonably over-compensate BLB for loss associated with Jet Linx's breach. Nevertheless, Jet Linx "substantially complied" with contract by completing the maintenance and repairs, delivering airworthy aircraft, and delivering many maintenance and repair documents. **See *Moss***, 306 N.W.2d at 158 (defining "substantially complied" with the contract as it relates to the property under construction and to damage calculation); **compare *Phipps v. Skyview Farms, Inc.***, 610 N.W.2d 723 (Neb. 2000) (cited by BLB) (relating to "substantial performance" of the contract, which is relevant to whether a breach of contract occurred, rather than damages).

Nevertheless, both expert witnesses testified maintenance deficiencies and missing part tags *could* have an effect on an aircraft's resale value. Flinn testified the

"direct effect on the value of an airplane" of deficient records "is basically whatever the cost is to correct whatever the deficiencies are." **See** TR. 360. As discussed above, there are no costs associated with the document retention deficiencies. Moreover, the record evidence shows BLB purchased and upgraded one aircraft in June 2007, which aircraft sold "as is" in January 2012. The court has no market value information on either aircraft, although Barry Bellue testified both aircraft were in top of the line condition, with no concerns for safety or airworthiness. The information provided by the parties render it impossible for the court to determine diminution in value for either aircraft. **See *Andrulis v. Levin Const. Corp.***, 628 A.2d 197, 207 (Md. 1993) (finding trial court committed error by determining value absent relevant property valuation figures).

Although Jet Linx breached its contract with BLB to maintain part tags and maintenance records in accordance with FAA regulations, BLB is not entitled to recovery because BLB's supposed damages are nonexistent and conjectural. The evidence in this case remains speculative at best with respect to cost-of-repair or diminution in value damages. Thus BLB is precluded from recouping damages under either theory of recovery.

**IT IS ORDERED**:

1. BLB is not entitled to damages associated with Jet Linx's breach of contract for retention of maintenance documents.

2. Judgment will be granted in favor of Jet Linx and against BLB for damages associated with Jet Linx's breach of contract for retention of maintenance documents.

Dated this 17th day of September, 2014.

                BY THE COURT:

                s/ Thomas D. Thalken
                United States Magistrate Judge